1   JOSEPH C. WILSON (#249027)
    jwilson@curialewilson.com
2   MICHELLE T. DUVAL (#239497)
    mduval@curialewilson.com
3   **CURIALE WILSON LLP**
    One Maritime Plaza, Suite 1000
4   San Francisco, CA 94111
    Tel: (415) 908-1001 / Fax:  (415) 796-0875
5
    JOSEPH W. COTCHETT (#36324)
6   jcotchett@cpmlegal.com
    FRANK M. PITRE (#100077)
7   fpitre@cpmlegal.com
    NANCY L. FINEMAN (#124870)
8   nfineman@cpmlegal.com
    ALISON E. CORDOVA (#284942)
9   acordova@cpmlegal.com
    **COTCHETT, PITRE & McCARTHY, LLP**
10  840 Malcolm Road
    Burlingame, CA 94010
11  Tel: (650) 697-6000 / Fax:  (650) 692-3606

12  *Attorneys for Plaintiff*

13

14

15                    **UNITED STATES DISTRICT COURT**

16                    **NORTHERN DISTRICT OF CALIFORNIA**

17

18  **DANIEL McGARRY, individually, and on**          Case No. _____
    **behalf of all others similarly situated,**
19                                                     **CLASS ACTION COMPLAINT**
            **Plaintiff,**
20
    v.                                                 **JURY TRIAL DEMANDED**
21
    **VOLKSWAGEN GROUP OF**                            1.  Violation of Magnuson-Moss Warranty
22  **AMERICA, INC.,**                                     Act
                                                       2.  Violation of California Consumers
23  **VOLKSWAGEN**                                         Legal Remedies Act
    **AKTIENGESELLSCHAFT,**                            3.  Violation of California B&P § 17200
24                                                     4.  Violations of California B&P § 17500
    **AUDI AG**                                        5.  Common Law Fraud
25                                                     6.  Breach of Implied Warranty
            **Defendants.**                            7.  Breach of Express Warranty
26

27

28

    **CLASS ACTION COMPLAINT**

1

**TABLE OF CONTENTS**

2    I.      **NATURE OF THE ACTION**..................................................................................1

3    II.     **THE PARTIES**..................................................................................................5

4            A.  Plaintiff Daniel McGarry .........................................................................5

5            B.  Defendant Volkswagen Aktiengesellschaft ............................................5

6            C.  Defendant Audi AG ................................................................................6

7            D.  Defendant Volkswagen Group of America, Inc. ...................................6

8    III.    **JURISDICTION AND VENUE**...........................................................................8

9    IV.     **FACTUAL ALLEGATIONS**...............................................................................9

10           A.  Federal and State Regulations Regarding Vehicle Emissions..................9

11           B.  By the Early 1990s, Japanese Automakers Had Overtaken Volkswagen in Car Sales
                 and Volkswagen Looked for Ways to Increase Sales and Used a Santa Clara County,
12               California Laboratory for Research..........................................................10

13           C.  Volkswagen Extensively Marketed Its Diesel Cars as Having Less Greenhouse Gas
                 Emissions than Other Cars While Having Greater Fuel Efficiency and Performance.12
14

15           D.  The Truth Is Revealed:  Volkswagen Admits to a Scheme to Knowingly and
                 Intentionally  Manipulating Class Vehicle's Emission Systems and the Class Vehicles
                 Were Actually Emitting Up to 40 Times the Legal Limit ...................................17
16

17           E.  Volkswagen's Admission to Fraudulently and Intentionally Evading Federal and State
                 Clean Air Emissions Standards.................................................................18

18           F.  Volkswagen's Defeat Devices Were Sophisticated Devices Intentionally Manufactured
                 and Installed In Class Vehicles In Violation of U.S. Law. ..................................22
19

20           G.  The Defeat Devices Installed by Volkswagen in the Class Vehicles Emit Pollutants
                 Known to Cause Serious Health Problems. ..................................................23

21           H.  By Engaging in this Scheme, Volkswagen Maintained Its Dominance in the Diesel
                 Vehicle Industry At the Detriment of Consumers and the Environment....................25
22

23           I.   Volkswagen Dominated the Diesel Vehicle Industry At the Cost of Well-Meaning
                  Consumers Who Paid A Substantial Premium Price for Class Vehicles That Were Not
                  In Fact "Clean." ....................................................................................27
24

25   V.      **PLAINTIFF AND THE CLASS WERE HARMED BY
             VOLKSWAGEN'S ACTIONS** ...........................................................................29

26   ///

27   ///

28

---

**CLASS ACTION COMPLAINT**                                                                    i

VI.    CLASS ACTION ALLEGATIONS .................................................................30

        FIRST CLAIM............................................................................................32

        SECOND CLAIM.......................................................................................33

        THIRD CLAIM ..........................................................................................35

        FOURTH CLAIM.......................................................................................36

        FIFTH CLAIM............................................................................................37

        SIXTH CLAIM............................................................................................39

        SEVENTH CLAIM .....................................................................................40

PRAYER FOR RELIEF..........................................................................................41

JURY DEMAND......................................................................................................42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff DANIEL McGARRY (hereinafter, "**Plaintiff**"), by and through his attorneys, bring this action on behalf of himself and all others similarly situated against Volkswagen Aktiengesellschaft (hereinafter, "Volkswagen AG"), Volkswagen Group of America, Inc., and Audi AG (collectively hereinafter, "**Volkswagen**").   Plaintiff alleges the following upon information and belief, except as to those allegations that pertain to the named Plaintiff:

## I.    NATURE OF THE ACTION

1.    "Volkswagen AG CEO Martin Winterkorn touted his company's efforts on Monday [July 19, 2010] to grow to be the world's biggest car maker, including an expansion of its new car lab in the Bay Area. 'We want to take Volkswagen to the top of the industry by 2018,' Volkswagen CEO Martin Winterkorn told reporters at the company's Electronics Research Laboratory in Palo Alto."[1]   This statement followed Volkswagen's pronouncements in its 2009 Sustainability Report that:   "We aim to be the most eco-friendly automaker in the world" and "For Volkswagen, 'green mobility' means setting new ecological standards in automobile manufacturing in order to put the cleanest, most economical and at the same time most fascinating cars on the road."[2]

2.    By 2015, Volkswagen seemed poised on its way to meet these goals.   As the Executive Director of Volkswagen Group of America, Electronics Research Laboratory, Ewald Goessmann emphasized in a June 29, 2015 Press Release issued from **Belmont, California** regarding test results on alternative fuels: "Evaluations like this are part of Volkswagen's broader holistic environmental strategy which underscores the company's commitment to the environment by deploying a comprehensive approach which addresses carbon reduction and sustainability at each part of the vehicle lifecycle."

3.    By September 2015, however, the truth came out.   Volkswagen had, since model year 2009, developed a scheme to evade compliance with United States emissions standards by

---

[1] Silicon Valley/San Jose *Business Journal* (July 20, 2010).

[2] 2009 Volkswagen 2009 Sustainability Report found at http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2009/09/sustainability_report0.bin.html/binarystorageitem/file/VW_Sustainability_Report_2009.pdf

1  the installation of software deliberately designed to fool testing devices and conceal the fact that
2  certain models of their diesel vehicles released emissions up to 40 times higher than what was
3  legally permitted under normal driving conditions.  These harmful emissions of the pollutant
4  nitrogen oxide (hereinafter, "NOx") contributes to the creation of ozone and smog. The pollutants
5  are known to be linked to numerous debilitating respiratory diseases.

6      4.    Volkswagen's brand has been severely tarnished and the value of its cars has
7  plummeted.  CEO Winterkorn was forced to state:  "Millions of people all over the world trust
8  our brand, our cars, and our technology. I am deeply sorry we have broken this trust. I would like
9  to make a formal apology to our customers, to the authorities, and to the general public for this
10  misconduct." On September 23, 2015, Winterkorn resigned as CEO of Volkswagen, stating that
11  *"[a]bove all, I am stunned that misconduct on such a scale was possible in the Volkswagen*
12  *Group."*[3]

13      5.    Plaintiff, on behalf of himself  and on behalf of a class of California residents who
14  purchased or leased Class Vehicles[4] (hereinafter, "**Class Members**"), brings this action
15  challenging Volkswagen's deceptive representations and omissions regarding the emissions
16  standards compliance and environmental-friendliness of nearly 500,000 U.S. vehicles in the 2009
17  to 2015 model years. As part of Volkswagen's broad-based media advertising campaign designed
18  to capitalize on public concern over human-induced climate change, Volkswagen utilized high-
19  impact television, the Internet, and print advertisements that misleadingly touted the fuel
20  economy, power, and "green" credentials of Volkswagen's supposedly "clean" diesel vehicles.
21  *Volkswagen claimed that the vehicles met or exceeded federal emissions standards when to the*
22  *contrary – the vehicles were built with sophisticated software designed to cheat environmental*
23  *pollution standards.*

24      6.    Volkswagen's scheme may have succeeded except for investigations, started in
25  2014 by the California Air Resources Board and the Environmental Protection Agency.  On or

26  ---

[3] *See* Fox Business's "Volkswagen CEO Resigns Amid Emissions Scandal" by Matthew Rocco, September 23, 2015.
http://www.foxbusiness.com/business-leaders/2015/09/23/volkswagen-ceo-resigns-amid-emissions-scandal/.

[4] *See* definition of "Class Vehicles" in Paragraph 8, *infra,* and definition of the "Class" in Paragraph 79, *infra.*

1 about September 18, 2015, the Obama Administration (hereinafter, "**Administration**") issued a
2 recall order that Volkswagen intentionally manipulated the emissions systems of approximately
3 500,000 U.S. vehicles over multiple model years.   Exhibit 1.   The Administration exposed
4 Volkswagen's illegal conduct by directing Volkswagen to recall all diesel-power vehicles in
5 which Volkswagen had illegally placed software in an effort to bypass requisite standards for
6 reducing smog.

7        7.        Specifically, Volkswagen knowingly and intentionally manipulated its vehicles'
8 emissions systems to deceitfully operate by installing so-called *"defeat devices"[5]* designed to
9 evade mandatory periodic state emissions testing.   Equipped with these devices, Volkswagen's
10 vehicles emit significantly less harmful emissions during testing than during normal driving
11 conditions. During *regular* operation of Volkswagen's supposedly environmentally-friendly
12 vehicles, the vehicles in fact emit *up to 40 times[6] the standard permitted* by United States laws
13 and regulations. The defeat devices in Volkswagen's vehicles operate by concealing the vehicles'
14 emission of the pollutant NOx, which contributes to the creation of ozone and smog. The
15 pollutants are known to be linked to numerous debilitating respiratory diseases including asthma
16 attacks, bronchitis, and emphysema.   Other correlated health ailments include lung damage and
17 premature death.[7]

18        8.        Volkswagen's deliberate scheme impacted at least the vehicles listed in the below
19 table (hereinafter, the "**Class Vehicles**").   Further investigation may uncover additional vehicle
20 models and model years affected by Volkswagen's illegal ploy.

21 ///

22

23 [5] The United States Environmental Protection Agency ("EPA") announced on September 18, 2015 that the "software
produced by Volkswagen is a 'defeat device,' as defined by the Clean Air Act." *See*
http://yosemite.epa.gov/opa/admpress.nsf/a883dc3da7094f97852572a00065d7d8/dfc8e33b5ab162b985257ec400578
24 13b!OpenDocument.

25 [6] *See*
http://yosemite.epa.gov/opa/admpress.nsf/a883dc3da7094f97852572a00065d7d8/dfc8e33b5ab162b985257ec400578
26 13b!OpenDocument.

27 [7] *See* U.S. National Library of Medicine's Tox Town (Environmental health concerns and toxic chemicals where you
live, work, and play): "Nitrogen Oxides" at http://toxtown.nlm.nih.gov/text_version/chemicals.php?id=19. Last
28 accessed September 22, 2015.

**CLASS ACTION COMPLAINT**                                                                 3

| Model Year | EPA Test Group | Make and Model(s) |
|---|---|---|
| 2009 | 9VWXV02.035N | VW Jetta, VW Jetta Sportwagen |
| 2009 | 9VWXV02.0U5N | VW Jetta, VW Jetta Sportwagen |
| 2010 | AVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2011 | BVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | CVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | CVWXV02.0U4S | VW Passat |
| 2013 | DVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2013 | DVWXV02.0U4S | VW Passat |
| 2014 | EVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2014 | EVWXV02.04US | VW Passat |
| 2015 | FVGAV02.0VAL | VW Beetle, VW Beetle Convertible, VW Golf, VW Golf Sportwagen, VW Jetta, VW Passat, Audi A3 |

9. As a result of Volkswagen's illegal conduct, every proposed Class Vehicle was deceitfully sold to consumers based on knowingly false representations concerning the actual environmental friendliness, fuel efficiency and performance of the vehicle. Volkswagen's widespread advertising based on these same factors for the Class Vehicles was also false and misleading.

10. Volkswagen's misrepresentations and omissions regarding the Class Vehicles' environmental credentials, fuel efficiency and performance in their advertising, public statements, and marketing information were a material factor in inducing Plaintiff and Class Members to purchase the Class Vehicles. As a result of Volkswagen's scam, *nearly 11 million conscientious consumers* worldwide purchased the Class Vehicles based on misleading and downright false claims of the vehicle's attributes. Had Plaintiff and Class Members known that the Class Vehicle's appealing combination of high fuel mileage and performance, with low emissions, were but a calculated scheme by Volkswagen to stealthily defeat environmental protection standards, Plaintiff and Class Members would not have purchased or leased their respective Class Vehicles, or in the alternative, Plaintiff and Class Members would have paid significantly less for the vehicles than they did.

11. This lawsuit seeks to remedy Volkswagen's premediated scheme to defraud the public.

## II.    **THE PARTIES**

### A.    **Plaintiff Daniel McGarry**

12.        Plaintiff Daniel McGarry is a resident of San Francisco, California, and a product manager for Twitter in San Francisco, California.    In 2015, he purchased a Model Year 2014 VW Jetta Sportwagon TDI.    Plaintiff purchased the Jetta specifically because it was advertised as being a clean, environmentally-friendly vehicle that also provided excellent power, performance, and fuel mileage.    Plaintiff conducted extensive research on the Jetta and competing vehicles before purchasing the Jetta.    Plaintiff would not have purchased the vehicle but for Volkswagen's representations regarding the "clean" emissions characteristics of the Jetta Sportwagon TDI.

### B.    **Defendant Volkswagen Aktiengesellschaft**

# VOLKSWAGEN

### AKTIENGESELLSCHAFT

13.        Established in 1937, Defendant Volkswagen Aktiengesellschaft (hereinafter, "**Volkswagen AG**") is a German car corporation organized and existing under the laws of Germany, with its principal place of business located in Wolfsburg, Germany. Volkswagen AG is the parent company of Volkswagen Group of America, Inc., also named as a Defendant in this Complaint. All three Defendants (Volkswagen AG, Audi AG, and Volkswagen Group of America, Inc.) are collectively referred to in this complaint as "**Volkswagen.**"

///
///
///
///
///
///
///

CLASS ACTION COMPLAINT                                                                                            5

1

**C.**     **Defendant Audi AG**



14.     In 1964, Volkswagen AG acquired Auto Union, and in 1969, Volkswagen AG acquired NSU Motorenwerke AG. Volkswagen AG merged Auto Union and NSU to create Audi AG (hereinafter, "**Audi**"), which has since been developed into Volkswagen's luxury vehicle brand. Audi is a German automobile manufacturer that designs, engineers, produces, markets, and distributes luxury automobiles, and is a majority owned (99.55%) subsidiary of Volkswagen AG. Since 2007, Audi has used the slogan "Truth in Engineering," and is among the best-selling luxury automobiles in the world.

**D.**     **Defendant Volkswagen Group of America, Inc.**

**VOLKSWAGEN**
GROUP OF AMERICA

     VW CREDIT, INC.

15.     Founded in 1955, Defendant Volkswagen Group of America, Inc. (hereinafter, "**VWoA**") is a wholly owned subsidiary of Volkswagen AG. VWoA is a corporation organized and in existence under the laws of the State of New Jersey and registered with the Secretary of State to conduct business in California. VWoA is one of the world's largest producers of

**CLASS ACTION COMPLAINT**                                                                           6

passenger cars. VWoA sells the Beetle, Beetle Convertible, CC, Eos, e-Golf, Golf, Golf GTI, Golf R, Golf SportWagen, Jetta, Passat, Tiguan, and Touareg vehicles through approximately 652 independent U.S. dealers.   VWoA's operations in the United States include research and development; parts and vehicle processing; parts distribution centers; sales, marketing and service offices; financial service centers; and its state-of-the-art manufacturing facility in Chattanooga, Tennessee (the Volkswagen Chattanooga Assembly Plant, which opened in 2011 and currently has over 3,200 Volkswagen employees and over 9,500 indirect supplier employees).



*Source:* http://www.volkswagengroupamerica.com/locations.html.

16.     Volkswagen also operates an Electronics Research Laboratory in ***Belmont, California***. The Volkswagen **Electronic Research Laboratory** is located at 500 Clipper Drive, Belmont, CA, 94002.  The Electronic Research Laboratory is part of the global research and development network that supports Volkswagens' brands including, Audi, Bentley, Bugatti, Lamborghini and VW.  The Electronic Research Laboratory is a subsidiary of VWoA, with the parent company being Volkswagen AG. ***The Electronic Research Laboratory was touted as***

1     *Volkswagen's largest research facility outside of Germany, and takes advantage of its proximity*

2     *to Silicon Valley to cultivate numerous partnerships to enhance the knowledge of Volkswagen.*

 

13     17.     During the relevant time, each Defendant acted as an agent, servant, employee,

14 and/or joint venture of the other Defendants and in doing the things alleged acted within the

15 course of such agency, employment, and/or in furtherance of the joint venture to accomplish the

16 scheme. Each of the Defendant's acts alleged herein was done with the permission and consent

17 of each of the other Defendants. While each of the Defendants are separate legal entities, each

18 Defendant works together under a common identity as portrayed to the public and there is

19 sufficient unity of interest and control between each Defendant such that the acts of one are for

20 the benefit and can be imputed to the acts of the other.

21

22     18.     During the relevant time, Volkswagen was engaged in the business of designing,

manufacturing, constructing, assembling, marketing, advertising, promoting, distributing, and/or

23 selling automobiles and other motor vehicles and motor vehicle components throughout the

24 United States.

25

26 **III.     JURISDICTION AND VENUE**

27     19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). The

28 matter in controversy exceeds $5,000,000 exclusive of interest and costs, and this matter is a class

**CLASS ACTION COMPLAINT**            8

1      action in which certain Class Members are citizens of states other than each Defendant's state of

2      citizenship.  The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff and

3      the Class have brought a claim pursuant to 15 U.S.C. § 2301 et seq.  This Court also has

4      supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

5            20.    This Court has personal jurisdiction over Plaintiff because Plaintiff resides in the

6      County of San Mateo, California, and submits to the Court's jurisdiction.  This Court has personal

7      jurisdiction over Volkswagen because Volkswagen has conducted and continues to conduct

8      substantial business in California and has sufficient minimum contacts with California in that: (1)

9      Volkswagen's Electronics Research Laboratory is located in *Belmont, California;* (2) its Test

10      Center is located in *Oxnard, California*; (3) its Design Center is located in *Santa Monica,*

11      *California;* (4) its Pacific Region Office is located in *Westlake Village, California*; and (5) one of

12      its Parts Distribution Centers is located in *Ontario, California*.

13            21.    Venue is proper in this Court under 28 U.S.C. § 1391 because Volkswagen sells a

14      substantial amount of automobiles in this District, has dealerships in this District, maintains and

15      operates a Test Center, Design Center, Western Regional Headquarters, and Parts Distribution

16      Center within this District, and many of Volkswagen's acts complained of herein occurred within

17      this District. Furthermore, a substantial part of the events alleged in this Complaint giving rise to

18      Plaintiff's claims, including the false and misleading advertising alleged herein, occurred in,

19      emanated from and/or were directed from this District. Venue is also proper in this Court because

20      Volkswagen caused harm to Class Members residing in this District.

21

22      **IV.**    **FACTUAL ALLEGATIONS**

23          **A.**    **Federal and State Regulations Regarding Vehicle Emissions**

24            22.    In 1970, Congress enacted the first major Clean Air Act, which has been amended.

25      The Clean Air Act required a 90% reduction in emissions from new automobiles by 1975.  In

26      1970, Congress also established the Environmental Protection Agency ("EPA"), which has broad

27      responsibility for regulating motor vehicle pollution.

28

**CLASS ACTION COMPLAINT**        9

23.    Congress' purpose in creating the Clean Air Act, in part, was "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(1)-(2).

24.    The Clean Air Act requires vehicle manufacturers to certify to the EPA that their products will meet applicable federal emission standards to control air pollution. The EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies applicable emission standards. Under this program, the EPA issues certificates of conformity and approves the introduction of vehicles satisfying the standards into United States commerce. **Every vehicle sold in the United States must be covered by an EPA-issued certificate of conformity.**[8] This includes light-duty motor vehicles such as the Class Vehicles at issue in this Complaint; the Class Vehicles needed to satisfy emission standards for certain air pollutants, including NOx. 40 C.F.R. § 86.1811-04. Clean Air Act § 101(b)(1) - (2), 42 U.S.C. § 7401(b)(1)-(2).

25.    California, through the California Air Resources Board ("CARB") also regulates emissions standards for vehicles. California's Low Emission Vehicle Regulations have emission reduction standards for automobiles.

**B.    By the Early 1990s, Japanese Automakers Had Overtaken Volkswagen in Car Sales and Volkswagen Looked for Ways to Increase Sales and Used a Santa Clara County, California Laboratory for Research.**

26.    In 1949, Volkswagen introduced in the United States the "VW Bug" and since then more than 5.5 million of this iconic car have been sold in this country.[9] For many years, Volkswagen was the top selling foreign car in the United States, but by the early 1990s, Japanese imports had completely overtaken Volkswagen and other European imports. Since then, Volkswagen has tried, mostly without success, to increase its sales in the United States. By the

---

[8] *Id.*

[9] https://media.vw.com/release/672/

1   mid-2000s, Volkswagen sought to diversify its car lineup, including designing vehicles for the

2   United States' market.[10]

3        27.    Volkswagen increased its research and development budget, spending over $10

4   billion in 2010. Volkswagen greatly relied on its Electronics Research Laboratory. Volkswagen

5   opened the Electronics Research Laboratory in Sunnyvale, California in 1998 with three

6   employees.  In 2002, the laboratory moved to Palo Alto. In July of 2010, Volkswagen's CEO

7   Martin Winterkorn visited the Palo Alto laboratory and announced: "We want to take

8   Volkswagen to the top of the industry by 2018."

9        28.    ▯  ▯  § of 2011, Volkswagen moved the Electronics Research Laboratory to a

10  157,000 square foot office building in Belmont. "The Electronics Research Laboratory

11  represents the entire Volkswagen Group in applied research and development."[11] "'The

12  Electronics Research Laboratory is another example of Volkswagen Group of America's

13  investment in the U.S., [Volkswagen Group of America President and CEO Jonathan] Browning

14  said, adding that Volkswagen Group has made a significant multi-million dollar investment in

15  the new facility. 'The commitment of the [Electronics Research Laboratory] teams to

16  automotive innovation will benefit drivers through safer, more eco-friendly driving experiences,

17  prompted by the technological heartbeat of Silicon Valley. I am excited to help showcase the

18  next generation of mobility today.'"[12]

19       29.    The research and innovation by Volkswagen through the Electronics Research

20  Laboratory and other laboratories was but one part of Volkswagen's plan.    Indeed, as revealed

21  by Volkswagen's EU Group's promotional brochures touting its Global Research activities, their

22  Electronic Research Lab in Belmont appears to have been a focal point of the scheme to defraud

23  the public. (See Exhibit 2) In addition, as part of its business plan to increase sales and market

24

25  _____

26  [10] http://www.cheatsheet.com/automobiles/volkswagens-big-north-american-problem.html/?a=viewall

27  [11] *PR News Wire*, "Researchers Showcase Latest Automotive Innovation for the Next Generation of Mobility, April 29, 2011.

28  [12] *Id.*

share, Volkswagen increased its emphasis on diesel cars and engaged in an extensive marketing campaign to sell more cars in the United States.

30.     One focus of Volkswagen's plan was to increase sales of its diesel vehicles. Volkswagen knew that consumers wanted environmentally friendly cars while still having fuel efficiency and powerful cars.  Volkswagen implemented a plan to increase sales of its diesel cars.

### C. Volkswagen Extensively Marketed Its Diesel Cars as Having Less Greenhouse Gas Emissions than Other Cars While Having Greater Fuel Efficiency and Performance.

31.     Advertising has been a key part of Volkswagen's business plan.  For the period of 2011-2013, Volkswagen spent over $2.9 billion per year world-wide on advertising.[13]

32.     As explained by Volkswagen's marketing chief, Tim Ellis in *USA Today*, even though 2008 was a tough ad year for Volkswagen, its ad expenditures would be the same in 2009.[14]

33.     In 2009, Volkswagen introduced a campaign called 'Meet the Volkswagens." "Five ads running over eight weeks will promote fuel efficiency, green credentials, cost of ownership and safety by highlighting VW's performance compared with rival brands."[15] "'Part of the big plan is for Volkswagen to grow the brand in the U.S.,' says Ellis. 'As part of that strategy, we can no longer afford to be a small, quirky niche brand here."[16]  The marketing included Volkswagen using Facebook with a link to a blog, tdi.vw.com/tdi to raise awareness of its "clean" diesel models.

/ / /

/ / /

/ / /

/ / /

---

[13] http://www.statista.com/statistics/286537/volkswagen-advertising-spending-worldwide/

[14] http://abcnews.go.com/Business/story?id=7493781

[15] *Id.*

[16] *Id.*

CLASS ACTION COMPLAINT                                                                     12

1   34.   Part of its campaign was the slogan that "Today's diesel-powered automobiles

2   aren't your father's diesel-powered automobiles." "VW had a simple message in each instances:

3   its autos are fuel-efficient, green and safe vehicles that won't break the bank."[17]



# This ain't your daddy's diesel.

Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency.   We've ushered in a new era of diesel.

• **Engineered to burn low-sulfur diesel fuel**
• **"Common Rail" direct injection system**

View key fuel efficiency info ?

Source: https://web.archive.org/web/20150816221300/http://www.vw.com/features/clean-diesel/.

16   35.   ***"This ain't your daddy's diesel,"*** boldly declared Volkswagen, an international

17   automotive conglomerate, in its sleek advertising campaign on their main webpage.[18]

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

---

26   [17]   http://www.edmunds.com/autoobserver-archive/2009/05/volkswagen-playing-truth-or-dare-to-market-its-diesel-vehicles.html

27   [18] *See* https://web.archive.org/web/20150816221300/http://www.vw.com/features/clean-diesel/. Last accessed September 22, 2015.

36.    Another example of Volkswagen's advertising touting its diesel cars



**Efficiency. Now available without compromise.**

Hybrids aren't the only game in town. TDI® Clean Diesel engines offer up impressive efficiency numbers too. Take the Passat TDI for starters. It can go up to 814 miles uninterrupted.    Now that's a game changer.

- **Seven efficient models to choose from**
- **Efficiency from up to 29    to 46    hwy mpg**
- **Ranges from up to 594    to 814    hwy miles on a single tank of fuel**

View key fuel efficiency and range info  ?

*This advertisement has since been removed from Defendant's webpage.* Source:
https://web.archive.org/web/20150816221300/http://www.vw.com/features/clean-diesel/.

37.    The Class Vehicles, as VWoA's Mark Barnes once boasted were "fantastic power train[s]" that give[] very good fuel economy." Yet "[i]t's also good for the environment because it puts out 25% less greenhouse gas emission than what a gasoline engine would. ***And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So a very very clean running engine. Clean enough to be certified in all 50 states.***"[19]

38.    From television to print advertisements to interviews to social media, Volkswagen represented the environmental-friendliness, fuel efficiencies of the Class Vehicles to the public.

39.    The advertising and promotion paid off as auto critics starting praising Volkswagen's diesel cars and sales increased.

[19] *See* Business Insider's "Volkswagen: Our Diesel Cars Whup the Prius and Other Hybrids," by Gayathri Vaidyanathan, October 9, 2009. http://www.businessinsider.com/volkswagen-preps-for-a-diesel-revolution-2009-10.

40.     In 2008, Jeep, Mercedes-Benz and Volkswagen were the only manufacturers selling diesels in light-duty vehicles in the United States.[20]   Edmunds, a highly regarded vehicle analyst, however, did not recommend any Volkswagen diesel cars as its top recommended. Instead, it recommended: "If you want more options, we'd advise waiting until 2009 when the ever popular Volkswagen Jetta TDI is slated to return to the U.S. as a 50-state vehicle."[21]

41.     Those recommendations began changing in 2009.  In 2009, Edmunds made one of its top recommended the 2009 Jetta, stating:  "Though the majority of diesel engines are sold in heavy-duty vehicles, the most anticipated of the new clean diesels coming out this year are a sedan (and a wagon): the 2009 Volkswagen Jetta TDI.  If you're shopping for a compact sedan or wagon, it's the only diesel game in town.  Starting at just a shade under $22,000 for the sedan and $23,600 for the base Sportwagen, the new clean Jetta TDI brings with it the German premium sedan feel without the premium sedan price.  The Jetta TDI also qualifies for a $1,300 alternative motor vehicle federal tax credit, which can help offset the small premium you pay for diesel efficiency."[22]

42.     In 2010, Edmunds recommended the Jetta as one of its top recommended diesels and stated: "The Volkswagen Jetta TDI, for example, enters its second year on the market as one of the most sought-after Jetta models, accounting for more than a third of stateside Jetta sales. Starting at about $23,000 for the sedan and $25,000 for the SportWagen, the Jetta TDI provides sprightly performance and a premium feel, along with the kind of fuel economy that only gasoline-electric hybrids can match.  It's a bit pricey, but its unique collection of virtues makes it an Edmunds staff favorite — and an interesting alternative to green machines like the Ford Escape Hybrid and Toyota Prius."[23]

///

[20] http://www.edmunds.com/diesel/2008/buying-guide.html
[21] *Id.*
[22] http://www.edmunds.com/diesel/2009/buying-guide.html
[23] http://www.edmunds.com/diesel/2010/buying-guide.html

**CLASS ACTION COMPLAINT**                                                          15

43.     In 2011, Edmunds recommended the Golf as one of its top recommended diesels and stated: "Our favorite is the Volkswagen Golf TDI, which exploits the traditional fuel-efficiency of its turbocharged four-cylinder diesel engine for truly frugal motoring when it comes to fuel cost per mile."[24]

44.     In 2012 Edmunds included the Golf as one of its top recommended diesels and stated: "Our favorite is the Volkswagen Golf TDI, which we feel offers a well-rounded package. It has the premium interior of a more upscale vehicle, is easy to load cargo in thanks to its hatchback, has a sporty suspension and is still capable of up to 42 mpg on the highway. The Volkswagen Jetta TDI offers the same engine/transmission combination, but the car's complete redesign for 2011 left us wholly unimpressed. If you are looking for a larger sedan, consider the more refined Volkswagen Passat TDI instead."[25]

45.     In 2013, Edmunds recommended both the Golf and the Passat as top recommended diesels: "While the Volkswagen Golf TDI is one of the best-selling cars in Europe, it hasn't yet taken U.S. buyers by storm. Part of the reason is its price, since the TDI is the top trim for the Golf. Still, we feel that the car is worth it because it offers a well-rounded package that few cars in its class can match. The Golf has the premium interior of a more upscale vehicle, is easy to load cargo in thanks to its hatchback, has a sporty suspension and is still capable of up to 42 mpg on the highway. [¶] The Volkswagen Passat TDI offers the same engine/transmission combination as the Golf TDI, but in a roomier midsize sedan body. The Passat earned top honors in our last 40 MPG Challenge, when it surpassed its own EPA numbers in real-world driving conditions. It is an excellent alternative to the Toyota Camry Hybrid or the Ford Fusion Hybrid."[26]

46.     In the first half of 2015, Volkswagen passed Toyota as the world's largest automaker. Volkswagen AG sold 5.4 million vehicles, including 295,000 in the United States, to

---

[24] http://www.edmunds.com/diesel/2011/buying-guide.html

[25] http://www.edmunds.com/diesel/2012/buying-guide.html

[26] http://www.edmunds.com/diesel/2013/buying-guide.html

Toyota's 5.02 million vehicles. [27] Volkswagen's projection of being the largest automaker in the world by 2018 appeared to be coming true, meeting the goal three years early.

**D.** **The Truth Is Revealed: Volkswagen Admits to a Scheme to Knowingly and Intentionally Manipulating Class Vehicle's Emission Systems and the Class Vehicles Were Actually Emitting Up to 40 Times the Legal Limit**

47.    In fact, the Class Vehicles were not environmentally friendly with fuel efficiency and power, but Volkswagen had knowingly and intentionally manipulated the Class Vehicle's emission system. The true facts were that the vehicles were actually emitting up to 40 times the legal limit. Volkswagen had hidden its scheme for over six (6) years, but it was finally revealed to the pubic in September of 2015.

48.    CARB and the EPA were first alerted to emissions problems with the Class Vehicles in May 2014 when the West Virginia University's (hereinafter, "WVU") Center for Alternative Fuels, Engines & Emissions published results of a study that found significantly higher in-use emissions from two of Volkswagen's light-duty diesel vehicles.

49.    Over the course of the year, Volkswagen continued to assert to both the CARB and the EPA that the increased emission from these vehicles could be attributed to various technical issues and unexpected in-use conditions. Volkswagen issued a voluntary recall in December 2014 to address the issue. CARB, in coordination with the EPA, conducted follow up testing of these vehicles both in the laboratory and during normal road operation to confirm the efficacy of the recall. When the testing showed only a limited benefit to the recall, the CARB broadened the tested vehicles to pinpoint the exact technical nature of the vehicles' poor performance and to investigate why the vehicles' onboard diagnostic system was not detecting the increased emissions.[28]

50.    None of the potential technical issues suggested by Volkswagen explained the higher test results consistently confirmed during the CARB's testing and it became clear that the

---

[27] http://www.latimes.com/business/la-fi-hy-vw-toyota-20150728-story.html

[28] *See* United States Environmental Protection Agency Notice of Violation (Volkswagen): http://www3.epa.gov/otaq/cert/violations.htm.

1 | CARB and the EPA would not approve certificates of conformity for Volkswagen's 2016 model
2 | year diesel vehicles until Volkswagen could adequately explain the anomalous emissions and
3 | ensure that the 2016 model year vehicles would not have similar issues.  Only then did
4 | Volkswagen admit it had designed and installed a defeat device in these vehicles in the form of a
5 | sophisticated software algorithm that detected when a vehicle was undergoing emission testing.[29]

### E.  Volkswagen's Admission to Fraudulently and Intentionally Evading Federal and State Clean Air Emissions Standards.

8 | 51.    On September 18, 2015, the EPA issued a notice of violation (hereinafter, "NOV")
9 | of the Clean Air Act, 42 U.S.C. §§ 7401 – 7671(q), and its implementing regulations to
10 | Volkswagen.    Exhibit 1.    Amongst other allegations, the NOV alleges that four-cylinder
12 | Volkswagen diesel cars from model years 2009-2015 contained software "manufactured and
12 | installed" by Volkswagen to deliberately circumvent EPA emission standards for certain air
13 | pollutants.[30]  "Therefore, VW violated section 203(a)(3)(B) of the Clean Air Act, 42 U.S.C. §
14 | 7522(a)(3)(B)."[31]  CARB also issued its own letter regarding Volkswagen's violations. Exhibit 3.

15 | 52.    Defeat devices bypass, defeat, or render inoperative elements of a vehicles'
16 | emission control system that exist to comply with Clean Air Act emission standards. Defeat
17 | devices, such as those installed in Volkswagen's Class Vehicles, sense whether the vehicle is
18 | being tested for compliance with EPA emission standards based on various inputs including the
19 | position of the steering wheel, vehicle speed, the duration of the engine's operation, and
20 | barometric pressure.  These inputs precisely track the parameters of the federal test procedure
21 | used for emission testing for EPA certification purposes.

22 | / / /
23 | / / /
24 |

---

25 | [29] *See* United States Environmental Protection Agency Notice of Violation (Volkswagen): http://www3.epa.gov/otaq/cert/violations.htm.

27 | [30] *See* United States Environmental Protection Agency Notice of Violation (Volkswagen): http://www3.epa.gov/otaq/cert/violations.htm.

28 | [31] *See* NOV from the United States Environmental Protection Agency, dated September 18, 2015.

---

**CLASS ACTION COMPLAINT**                                                                 18



*An example of Volkswagen's "clean" diesel engine.* Source:
http://www.automobilemag.com/features/news/volkswagen-cheating-scandal-expands-to-11-million-diesels-worldwide/.

53.     Due to the existence of the defeat devices in Volkswagen's Class Vehicles, the Class Vehicles do not conform in all material respects to the vehicle specifications described in the applications for the certificates of conformity that purportedly cover them. Therefore, Volkswagen also violated section 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), by selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing these vehicles, or for causing any of the foregoing acts.

54.     By making and selling vehicles with defeat devices that allowed for higher levels of air emissions than they certified to the EPA, Volkswagen violated the Clean Air Act. *"Using [these] defeat devices in cars to evade clean air standards is illegal and a threat to public health,"* said Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance.[32]

---

[32] *See* United States Environmental Protection Agency News Release: "EPA, California Notify Volkswagen of Clean Air Act Violations."
http://yosemite.epa.gov/opa/admpress.nsf/6424ac1caa800aab85257359003f5337/dfc8e33b5ab162b985257ec4005781 3b!OpenDocument. Last accessed September 22, 2015.

55.     Indeed, *Volkswagen AG's CEO Martin Winterkorn acknowledged as much and admitted to Volkswagen's illegal misconduct* as news of the 7-year-long scandal broke: "Millions of people all over the world trust our brand, our cars, and our technology. I am deeply sorry we have broken this trust. I would like to make a formal apology to our customers, to the authorities, and to the general public for this misconduct."   On September 23, 2015, Mr. Winterkorn resigned as CEO of Volkswagen, stating that *"[a]bove all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group."*[33]

56.     Michael Horn, the head of VWoA, also admitted that Volkswagen has "totally screwed up." "Let's be clear about this, our company was dishonest with the [EPA] and the California air resources board [*sic*], and with all of you."[34]

57.     As a result of Volkswagen's admitted scandal, Volkswagen's brand and reputation have been irreparably damaged, as evidenced by Volkswagen's ever-tanking stock price in the hours and days following the EPA's NOV. The Administration's forced recall has also damaged Volkswagen's brand, reputation and re-sale values.  Volkswagen recognizes the damage to their brand and reputation, setting aside $7.2 billion to pay for their emissions cheating scheme.[35] "'The Volkswagen brand is at risk,' Mike Jackson, CEO of Auto Nation, told CNBC today [September 23, 2015]."[36]

///

///

///

///

---

[33] *See* Fox Business's "Volkswagen CEO Resigns Amid Emissions Scandal" by Matthew Rocco, September 23, 2015. http://www.foxbusiness.com/business-leaders/2015/09/23/volkswagen-ceo-resigns-amid-emissions-scandal/.

[34] *See* CNN Money's "Volkswagen scandal widens" by Mark Thompson and Ivana Kottasova, September 22, 2015. http://money.cnn.com/2015/09/22/news/vw-recall-diesel/.

[35] *See* Volkswagen Sets Aside $7.2 Billion to Pay for Emissions Cheating Scandal," by Paul A. Eisenstein, NBC News, September 22, 2015. http://www.nbcnews.com/business/autos/volkswagen-sets-aside-7-2-billion-pay-emissions-cheating-scandal-n431456.

[36]      http://www.timesfreepress.com/news/business/aroundregion/story/2015/sep/23/biggest-vw-dealer-says-volkswagen-brand-risk/326700/

---

**CLASS ACTION COMPLAINT**                                                                          20

1    58.    The following shows how investors reacted to the disclosure of the scheme:



# Investors' reaction to Volkswagen emissions saga

Source: http://fortune.com/2015/09/23/volkswagen-stock-drop/.

59.    Internal investigations revealed that Volkswagen's "misconduct," originally thought by U.S. regulators to involve some 500,000 vehicles, in fact could involve nearly 11 million vehicles worldwide.[37] *Over 77,000 of these Class Vehicles were sold in California alone.*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[37] *See* CNN Money's "Volkswagen scandal widens" by Mark Thompson and Ivana Kottasova, September 22, 2015. http://money.cnn.com/2015/09/22/news/vw-recall-diesel/.

**CLASS ACTION COMPLAINT**                                                      21

1

**F.**    **Volkswagen's Defeat Devices Were Sophisticated Devices Intentionally Manufactured and Installed In Class Vehicles In Violation of U.S. Law.**

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    *An example of one of the Class Vehicles (2010 Volkswagen Golf TDI) containing a "defeat device," as defined by the Clean Air Act.* Source: http://wheels.blogs.nytimes.com/2009/12/30/thrift-and-thrills-with-vw-golf-tdi-and-gti/?_r=0.

17

18    60.    Volkswagen's Class Vehicles were equipped with a sophisticated software

19    algorithm that was designed to detect when the vehicle was undergoing official emissions testing.

20    Full emissions controls were turned on only during these mandated tests. ***During all other times***

21    ***of normal driving, the effectiveness of the Class Vehicles' pollution emissions control devices***

22    ***was manipulated by Volkswagen to be greatly reduced.***[38]

23    61.    Specifically, during EPA emission testing, the Class Vehicles' electronic control

24    module (hereinafter, "ECM") ran software which produced compliant emission results under an

25    ECM calibration that Volkswagen referred to as the "dyno calibration" (referring to the

26    _____

[38] *See* United States Environmental Protection Agency News Release: "EPA, California Notify Volkswagen of Clean
27    Air Act Violations."
http://yosemite.epa.gov/opa/admpress.nsf/6424ac1caa800aab85257359003f5337/dfc8e33b5ab162b985257ec4005781
28    3b!OpenDocument. Last accessed September 22, 2015.

_____

**CLASS ACTION COMPLAINT**                                                    22

dynamometer, the equipment used in emissions testing). At all other times during normal vehicle operation, the software was activated and the Class Vehicle's ECM software ran a separate "road calibration" which reduced the effectiveness of the emission control system. As a result, emissions of NOx increased by a factor of 10 to 40 times above the EPA compliant levels, depending on the type of drive cycle.

62. Based on the design of Volkswagen's defeat devices, it is clear that Volkswagen knew that its devices would bypass, defeat, or render inoperative elements of the vehicle related to compliance with the Clean Air Act emission standards because "the software was designed to track the parameters of the federal test procedure and *cause emission control system to underperform when the software determined that the vehicle was not undergoing the federal test procedure.*"[39]

63. Put simply, Volkswagen's defeat device results in cars that meet emissions standards in the laboratory or testing station, but during everyday operation, the device is programmed in such a manner that emits NOx at up to *40 times the standard permitted* by U.S. health regulations.

### G.   The Defeat Devices Installed by Volkswagen in the Class Vehicles Emit Pollutants Known to Cause Serious Health Problems.

64. The Clean Air Act and the regulations promulgated thereunder aim to protect human health and the environment by reducing emissions of NOx and other pollutants from mobile sources of air pollution. NOx pollution generates nitrogen dioxide, and contributes to ground-level ozone and fine particulate matter.

/ / /

/ / /

/ / /

/ / /

---

[39] *See* United States Environmental Protection Agency News Release: "EPA, California Notify Volkswagen of Clean Air Act Violations."



*A photo on the American Lung Association ® website provided by the EPA*
Source: http://www.cleanairstandards.org/about-this-website/.

65.     Exposure to these pollutants has been associated with a range of serious health effects, including increased asthma attacks and other respiratory illnesses.  Exposure to ozone and particulate matter – which causes cancer[40] – has been linked with an increased risk of heart attacks, strokes, and premature death due to respiratory-related or cardiovascular-related effects. Recent studies have shown that not only can nitrogen dioxides cause or exacerbate a number of health conditions, but exposure to these toxins are correlated with lower birth weight and smaller head circumference in babies.[41]  Particularly at risk for health effects of these pollutants are the children, the elderly, and people with pre-existing respiratory disease.[42]

---

[40] *See* BBC's "Diesel cars: Is it time to switch to a cleaner fuel?" Richard Anderson, BBC News, July 16, 2015. http://www.bbc.com/news/business-33254803.

[41] "Review of evidence on health aspects of air pollution – REVIHAAP Project," world Health Organization, Regional Office for Europe, World Health Organization 2013.

**H.   By Engaging in this Scheme, Volkswagen Maintained Its Dominance in the Diesel Vehicle Industry At the Detriment of Consumers and the Environment.**

66.     Both the United States and California governments have encouraged the use of diesel engines to meet fuel efficiency and greenhouse gas targets.  As a result, the largest selling factor for diesel cars is their fuel economy and low carbon emissions as compared to standard gasoline engines. Diesel fuel also contains more energy density than petrol.  These characteristics result in anywhere from 20% to 40% better fuel economy, and is also known for giving vehicles more powerful hauling capacity. "Some of the diesel cars can go 600, 700 miles on a single fill-up. That's a very high value for many consumers," says Allen Schaeffer, executive director of the Diesel Technology Forum.

67.     However, this appealing combination comes at a price – diesel cars emit far more NOx than standard gasoline engines.[43]  As Volkswagen has admitted, Class Vehicles contained software designed to falsify emissions test results, spewing out NOx levels up to 40 times higher than what is detected by the emissions tests.

68.     Diesel engines also cost consumers substantially more upfront when purchasing the vehicles.  Class Members paid a significant premium for their Class Vehicles, purportedly designed to be "[e]fficien[t]. Now available without compromise."[44] "Feel the fun, torque-y, turbocharged power of a TDI Clean Diesel engine and you'll almost forget it's efficient."[45]  These representations and the others detailed, *supra*, were false.

/ / /

http://www.euro.who.int/__data/assets/pdf_file/0004/193108/REVIHAAP-Final-technical-report-final-version.pdf?ua=1

[42] *See* United States Environmental Protection Agency News Release: "EPA, California Notify Volkswagen of Clean Air Act Violations." http://yosemite.epa.gov/opa/admpress.nsf/6424ac1caa800aab85257359003f5337/dfc8e33b5ab162b985257ec40057813b!OpenDocument. Last accessed September 22, 2015.

[43] "Volkswagen boss quits over diesel scandal." Andreas Cremer, Reuters Business News, September 23, 2015. http://www.reuters.com/article/2015/09/23/us-usa-volkswagen-idUSKCN0RL0II20150923.

[44] *See* https://web.archive.org/web/20150816221300/http://www.vw.com/features/clean-diesel/ for Defendant's advertisement describing their "fun-fueled" diesel engines. Defendant's advertisement has since been removed.

[45] *See* https://web.archive.org/web/20150816221300/http://www.vw.com/features/clean-diesel/ for Defendant's advertisement describing their "fun-fueled" diesel engines. Defendant's advertisement has since been removed.

69.     Volkswagen's defeat devices also had associated "benefits" (to Volkswagen) other than allowing their Class Vehicles to pass by emissions tests unnoticed: experts in automotive technology explained that disengaging the pollution controls on a diesel-fueled car can yield better performance, including increased torque and acceleration.  These features increased the Class Vehicles' selling appeal.  "When the pollution controls are functioning on these vehicles, there's a trade-off between performance and emissions," said Drew Kodjak, executive director of the International Counsel on Clean Transportation, a research group.  "This is cutting corners."[46]

70.     While hiding from the public that they were intentionally disregarding United States regulations put in place to protect consumers and the environment, Volkswagen dominated the U.S. diesel-car market.  Indeed, Volkswagen's sales of diesel vehicles in the United States in 2013 comprised 78% of all light-vehicle diesel deliveries nationwide.[47]

71.     According to an analysis of federal incentives, as a result of Volkswagen's scheme, United States taxpayers were also tricked into shelling out $51 million in green subsidies for "clean" Class Vehicles due to $1,300 tax credits available to buyers of about 39,500 Jetta and Jetta Sportwagen models sold in 2009.[48]

72.     As Oliver Schmidt, manager of VWoA's U.S. environmental office boasted in 2013, Volkswagen first offered a diesel car in the U.S. in 1976 and has dominated the niche ever since.  As such, Schmidt continued, "[t]he Volkswagen Groups is a leader in clean-diesel technology."[49]  *What Schmidt neglected to disclose was that Volkswagen's solid dominance in the diesel niche involved stealthily circumventing the United States emissions laws by tampering their vehicles with hidden software programmed to specifically do so.*

[46] *See* "VW Is Said to Cheat on Diesel Emissions; U.S. to Order Big Recall," Coral Davenport and Jack Ewing, The New York Times, September 18, 2015.

[47] *See* 2013 CAR Management Briefing Seminars, "VW Details New Diesel Engine for 2014" by Drew Winter, August 6, 2013. http://wardsauto.com/vehicles-amp-technology/vw-details-new-diesel-engine-2014.

[48] "U.S. taxpayers duped into shelling out $51 million in green subsidies for 'clean' VW vehicles" by Jerry Hirsch, Los Angeles Times, September 21, 2015.

[49] *See* 2013 CAR Management Briefing Seminars, "VW Details New Diesel Engine for 2014" by Drew Winter, August 6, 2013. http://wardsauto.com/vehicles-amp-technology/vw-details-new-diesel-engine-2014.

I.   **Volkswagen Dominated the Diesel Vehicle Industry At the Cost of Well-Meaning Consumers Who Paid A Substantial Premium Price for Class Vehicles That Were Not In Fact "Clean."**

73.   To perpetuate their fraudulent scheme of overcoming consumer perceptions of "dirty" diesel vehicles, Volkswagen charged a substantial premium on their "clean" diesel vehicles – which Volkswagen ironically marketed under the term "Clean Diesel."

74.   Volkswagen proclaimed that "[l]ong range without sacrifice is the promise of TDI Clean Diesel.  And Volkswagen has sold more diesel cars in the U.S. than every other brand combined.  Promise kept." This promise was not kept, and millions of conscientious consumers worldwide were reasonably duped into believing Volkswagen's "Clean Diesel" ploy – and paid thousands of dollars more for the diesel "benefits" that Volkswagen knew did not in fact exist.

75.   As seen by the three charts below, Volkswagen charged a significant premium on all Class Vehicles in which Volkswagen installed its "defeat device."  **Table 1** lists the prices of standard, non-clean diesel vehicle models.  **Table 2** lists the prices of Clean Diesel models; a substantial price increase can be compared between Table 2 and Table 1.  **Table 3** calculates and compares the difference – the unsubstantiated premium consumers paid as a result of Volkswagen's unfair, deceptive, and fraudulent business practices.

**TABLE 1: Prices of Standard Non-*Clean Diesel* Models***

| *Model* | *Base Price* | *Mid-Level Price* | *Top-Line Price* |
|---|---|---|---|
| VW Jetta | $18,780 | $19,775 | $20,095 |
| VW Jetta SportWagen | $21,265 | $27,025 | $29,385 |
| VW Beetle | $20,695 | $23,605 | $25,885 |
| VW Golf (2-Door) | $18,495 | N/A | $19,575 |
| VW Golf (4-Door) | $20,175 | $22,625 | $25,225 |
| VW Passat | $21,340 | $24,375 | $23,995 |
| Audi A3** | $30,900 | $33,600 | $39,750 |

/ / /

/ / /

/ / /

---

**CLASS ACTION COMPLAINT**                                                                 27

**TABLE 2: Prices of *Clean Diesel* Models***

| Model | Base Price | Mid-Level Price | Top-Line Price |
|---|---|---|---|
| VW Jetta | $21,640 | $24,075 | $26,410 |
| VW Jetta SportWagen | $24,575 | $28,025 | $30,385 |
| VW Beetle | $25,330 | N/A | $28,525 |
| VW Golf (2-Door) | $21,975 | N/A | N/A |
| VW Golf (4-Door) | $22,575 | $26,225 | $28,425 |
| VW Passat | $27,095 | $29,125 | $30,850 |
| Audi A3** | $33,200 | $35,900 | $42,050 |

**TABLE 3: *Clean Diesel* Price Premiums***

| Model | Base PREMIUM | Mid-Level PREMIUM | Top-Line PREMIUM |
|---|---|---|---|
| VW Jetta | $2,860 | $4,300 | $6,315 |
| VW Jetta SportWagen | $3,310 | $1,000 | $1,000 |
| VW Beetle | $4,635 | N/A | $2,640 |
| VW Golf (2-Door) | $3,480 | N/A | N/A |
| VW Golf (4-Door) | $2,400 | $3,600 | $3,200 |
| VW Passat | $5,755 | $4,750 | $6,855 |
| Audi A3** | $2,300 | $2,300 | $2,300 |

*All VW pricing gathered from "Wayback Machine" and is dated September 17, 2015. All TDI models have since been removed from Volkswagen's current website.

**Audi pricing taken from Volkswagen's current website.

76. "Because by building efficient vehicles that people actually want to drive, we're also building a better future for all of us," stated Volkswagen proudly on its main webpage just a few days ago – which has since disappeared.[50] *As it turns out, the only future Volkswagen was building was a future for themselves – at the cost of and to the detriment of nearly 11 million conscientious consumers worldwide.*

///

///

///

///

---

[50] *See* https://web.archive.org/web/20150816221300/http://www.vw.com/features/clean-diesel/.

**CLASS ACTION COMPLAINT**                                                                 28

*Volkswagen's fraudulent advertisement, now since removed from their webpage.* Source:
https://web.archive.org/web/20150816221300/http://www.vw.com/features/clean-diesel/.

## V. PLAINTIFF AND THE CLASS WERE HARMED BY VOLKSWAGEN'S ACTIONS

77.     As a result of Volkswagen's actions, Plaintiff and the Class have been harmed. Plaintiff and Class Members would never have purchased the Class Vehicles, and/or would have paid substantially less for their vehicles. The Class Vehicles have lost value because of Defendants' actions and are not worth as much in a trade or sale as if the vehicle had been as warranted. There is this actual harm and also the harm to the brand, all which decreases the value of the Class Vehicles.

78.     It is likely that the Class Vehicles will be recalled and Plaintiff and the Class will lose the use of their vehicles. Further, after the Class Vehicles are remediated, the vehicles will have reduced fuel economy and reduced acceleration during real world use in order that the vehicles can comply with federal emission standards. Accordingly, Plaintiff and Class Members have sustained incidental and consequential damages as herein alleged.

/ / /

/ / /

/ / /

1    **VI.   CLASS ACTION ALLEGATIONS**

2          79.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

3    Procedure 23 on behalf of himself and all others similarly situated. Plaintiff seeks to represent a

4    Class (herein, the **"Class"**) initially defined as:

5

6                    All current and former owners of Class Vehicles who reside in the
                     State of California and/or who purchased or leased Class Vehicles
7                    in California. Expressly excluded from the Class are Defendants
                     and their subsidiaries, affiliates, officers, directors, and employees.

8

9          80.    Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(a), 23(b),

10   23(b)(2), or 23(b)(3). The proposed Class is composed of tens of thousands of persons dispersed

11   throughout California and joinder is impracticable. The precise number and identity of Class

12   Members are unknown to Plaintiff at this time, but can be obtained from Volkswagen's internal

13   records.

14         81.    There are questions of law and fact common to the members of the Class, which

15   predominate over questions affecting only individual Class Members, *inter alia*:

16                 •       Whether Volkswagen misrepresented the environmental friendliness,

17   emission standards compliance and credentials, fuel efficiency and/or performance of the

18   Class Vehicles;

19                 •       Whether Volkswagen misrepresented the emissions levels, fuel efficiency

20   and/or performance that the Class Vehicles could achieve under normal driving

21   conditions;

22                 •       Whether Volkswagen publicized and advertised the environmental

23   friendliness, fuel emission compliance, fuel efficiency and/or performance of the Class

24   Vehicles;

25                 •       Whether Volkswagen's publicity and advertising regarding the

26   environmental friendliness, fuel emission compliance, fuel efficiency and/or performance

27   of the Class Vehicles was misleading;

28

**CLASS ACTION COMPLAINT**                                                          30

- Whether Volkswagen has engaged in unlawful, unfair or fraudulent business practices;
- Whether Volkswagen's misrepresentations and omissions regarding the compliance with emissions levels, environmental friendliness, fuel efficiency and/or performance of the Class Vehicles has deceived or is likely to have deceived Plaintiff and the Class;
- Whether Volkswagen's conduct violated the Magnuson-Moss Warranty Act;
- Whether Volkswagen's conduct violated the California Consumer Legal Remedies Act;
- Whether Volkswagen's conduct violated California Business and Professions Code § 17200, *et seq.*;
- Whether Volkswagen's conduct violated California False Advertising Law (Business and Professions Code § 17500, *et seq.*);
- Whether Volkswagen breach express and/or implied warranties;
- Whether Volkswagen's unlawful, unfair or deceptive practices have harmed Plaintiff and the Class Members;
- Whether Plaintiff and the Class Members are entitled to equitable or injunctive relief and,
- Whether Plaintiff and the Class Members are entitled to damages, including punitive damages.

82. Plaintiff is a member of the Class and Plaintiff's claims are typical of the claims of the Class.

83. Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the interests of the Class and have no interests adverse to or which conflict with the interests of the other members of the Class.

///

84.     The self-interest of Plaintiff is co-extensive with and not antagonistic to those of absent Class Members. Plaintiff will undertake to represent and protect the interests of absent Class Members.

85.     Plaintiff has engaged the services of counsel who are experienced in complex class litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent the Plaintiff and absent Class Members.

86.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistency and varying adjudications, establishing incompatible standards of conduct for Volkswagen.

87.     Volkswagen has acted on grounds generally applicable to the Class, thereby making relief with respect to the Class Members as a whole appropriate.

88.     A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Prosecution of the complaint as a class action will provide redress for individual claims too small to support the expense of complex litigation and reduce the possibility of repetitious litigation.

89.     Plaintiff anticipates no unusual management problems with the pursuit of this Complaint as a class action.

## FIRST CLAIM

### Violation of the Magnuson-Moss Warranty Act

### 15 U.S.C. § 2301 et seq.

### (On Behalf of Plaintiff and the Class)

90.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully set forth hereinafter.

91.     Plaintiff and the Class bring this claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. ("the Act").

92.     The Class Vehicles are consumer products as defined in 15 U.S.C. § 2301(1).

93.     Defendants, and each of them, are a supplier and warrantor as defined in 15 U.S.C. § 2301(4),(5).

94. Plaintiff and the Class received written warranties as defined in 15 U.S.C. §2301(6)(A) and/or (B), which Defendants have breached.

95. Plaintiff and the Class are "consumers" as defined in 15 U.S.C. § 2301(3). They are consumers because they bought a Class Vehicle, they are entitled under California law to enforce both written and implied warranties.

96. Pursuant to 15 U.S.C. § 2310(e), Plaintiff and the Class are not required to provide Defendants notice of this class action and an opportunity to cure until the time the Court determines the representative capacity of Plaintiff pursuant to F.R.Civ.P. 23.

97. Defendants, and each of them, are liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1) because they breached their written warranties.

98. Further, in connection with the sale of the Class Vehicles, Defendants gave an implied warranty under the Act. As part of that implied warranty, Defendants warranted that the Class Vehicle complied with all applicable federal and state regulations, including emission regulations. Defendants breached the implied warranty of merchantability.

99. Plaintiff and the Class are entitled to damages caused by Defendants' breaches of the warranties, including economic damages based upon either a return of Class Members purchase price; and/or the difference between the price paid for the Class Vehicle as warranted and the actual value of the Class Vehicle as delivered, and consequential damages.

100. In addition, Plaintiff and the Class are entitled to reasonable attorneys' fees and costs as determined by the Court.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SECOND CLAIM

### Violations of the Consumers Legal Remedies Act,

### California Civil Code § 1750, *et seq.*

### (On Behalf of Plaintiff and the Class)

101. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully set forth hereinafter.

/ / /

---

**CLASS ACTION COMPLAINT**                                                                33

1    102.    This cause of action is brought pursuant to the California Consumers Legal

2    Remedies Act ("CLRA"), Civil Code section 1750, *et seq*.  Plaintiff brings this action on his own

3    behalf and on behalf of the Class Members, all of whom are similarly situated consumers within

4    the meaning of Civil Code section 1781.

5    103.    The acts and practices described in this Complaint were intended to result in the

6    sale of goods, specifically a motor vehicle, in consumer transactions.  Defendants, and each of

7    them, violated, and continue to violate, the CLRA, Civil Code section 1770, subdivisions (a)(9),

8    (a)(7), (a)(16), and (a)(5) by:

9    •    Representing to consumers purchasing the Class Vehicles that these vehicles'

10   emissions, fuel efficiency and high performance are as advertised and publicized.

11   •    Representing in their advertising emissions, environmental, fuel efficiency and

12   performance characteristics for the Class Vehicles that are false.

13   104.    Plaintiff and the Class Members have suffered harm as a result of these violations.

14   105.    Plaintiff has suffered as a result of Defendants' unlawful conduct because she

15   purchased the Class Vehicles believing, based on Defendants' representations, that the vehicles

16   had certain characteristics that made them environmentally friendly, fuel efficient and with high

17   performance, when in fact these vehicles can have these fuel efficient and performance standards

18   because their emissions do not comply with governmental regulations.  These misrepresentations

19   also resulted in higher purchase prices for the Class Vehicles and the subsequent revelation

20   concerning the "defeat devices" will result in lower resale value.

21   106.    Defendants, and each of them, concealed from Plaintiff and the Class Members

22   accurate information concerning the emissions standards, fuel efficiency and performance of the

23   Class Vehicles.

24   107.    Defendants' misrepresentations and omissions described in the preceding

25   paragraphs were intentional, or alternatively, made without the use of reasonable procedures

26   adopted to avoid such errors.

27   108.    Defendants, directly or indirectly, have engaged in substantially similar conduct

28   with respect to Plaintiff and to each member of the Class.

CLASS ACTION COMPLAINT                                                                34

109.   Unless Defendants are enjoined from engaging in such wrongful actions and conduct in the future, members of the consuming public will be further damaged by Defendants' conduct.

110.   Plaintiff and the Class are entitled to equitable relief on behalf of the Class Members in the form of an order, pursuant to Civil Code section 1780, subdivision (a)(2)-(5), prohibiting Defendants from continuing to engage in the above-described violations of the CLRA.  Plaintiff and the Class further seek reasonable attorneys' fees under Civil Code section 1780(e).

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### THIRD CLAIM

**Violation of California Business and Professions Code § 17200, *et seq.***

**Unlawful Business Acts and Practices**

**(On Behalf of Plaintiff and the Class)**

111.   Plaintiff incorporates by reference each of the paragraphs set forth above as though fully set forth hereinafter.

112.   Business & Professions Code section 17200, *et seq.* prohibits acts of "unfair competition" which is defined by Business & Professions Code section 17200 as including any "any unlawful, unfair or fraudulent business act or practice . . . ."

113.   Defendants, and each of them, have violated and continue to violate Business & Professions Code section 17200's prohibition against engaging in "unlawful" business acts or practices, by, *inter alia,* the following:

- Violating the CLRA, Civil Code section 1750, *et seq.* (as alleged herein);
- Violating federal environmental laws, including the Clean Air Act; and
- Violating Business & Professions Code section 17500, *et seq.* (as further alleged herein).

114.   Defendants, and each of them, also acted fraudulently and unfairly for purposes of section 17200. Defendants' misrepresentations and omissions regarding the Class Vehicles' emissions, environmental standards, fuel efficiency, and performance in their advertising, public

---

**CLASS ACTION COMPLAINT**                                                    35

statements and marketing were a material factor in inducing Plaintiff to purchase his Class Vehicle. Plaintiff suffered injury in fact and lost money and/or property as a result of Defendants' unlawful business acts and practices and Class Members have suffered harm when each was required to pay a purchase price for their Class Vehicles which they never would have purchased if the true facts were known; or paid a price in excess of what a Class Member would have paid if Defendants had accurately disclosed the Class Vehicles' characteristics; and in the form of decreased resale value of the Vehicles.

115. As a result of Defendants' violations of the Business & Professions Code section 17200, *et seq.*, Plaintiff and the Class are entitled to equitable relief in the form of full restitution for the inflated sale price of the Vehicles.

116. Plaintiff and the Class also seek an order enjoining Defendants from continuing their unlawful business practices and from such future conduct.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### FOURTH CLAIM

**For Violations of the California False Advertising Law,**

**Bus. & Prof. Code § 17500, *et seq.***

**(On Behalf of Plaintiff and the Class)**

117. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully set forth hereinafter.

118. Defendants, and each of them, violated California's False Advertising Law, Business & Professions Code section 17500, *et seq.*by using false and misleading messages regarding the environmental friendliness, emissions, fuel efficiency and performance of the Class Vehicles in television, print, and Internet advertising.

119. These representations and/or omissions have deceived and are likely to deceive Plaintiff, the Class, and consumers across the country in connection with their decision to purchase Class Vehicles. Defendants' representations and/or omissions were material and were a substantial and material factor in Plaintiff's decision to purchase his Class Vehicle. Had Plaintiff known the actual facts, she would not have purchased the Class Vehicles and/or paid

more than she would have had Defendants accurately disclosed the Class Vehicles'
characteristics.

120.    Defendants, directly and indirectly, have engaged in substantially similar conduct
with respect to Plaintiff and to each member of the Class.

121.    Plaintiff suffered injury in fact and lost money and/or property as a result of
Defendants' false and misleading advertising and Class Members suffered harm when they were
required to pay a purchase price in excess of what a Class member would have paid if
Defendants had accurately disclosed the Class Vehicles' characteristics and in the form of
decreased resale value of the Class Vehicles.

122.    As a result of Defendants' violations, Plaintiff and the Class are entitled to
equitable relief in the form of full restitution of all monies paid for the sales price of the Class
Vehicles, diminished value of the Class Vehicles, and/or disgorgement of the profits derived
from Defendants' false and misleading advertising.

123.    Plaintiff also seeks an order enjoining Defendants from such future conduct.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### FIFTH CLAIM

#### For Common Law Fraud

#### (On Behalf of Plaintiff and the Class)

124.    Plaintiff incorporates by reference each of the paragraphs set forth above as though
fully set forth hereinafter.

125.    Defendants, and each of them, misrepresented, omitted and concealed important
facts from Plaintiff as alleged in the Complaint, including the following:

• Representing to consumers purchasing the Class Vehicles that these vehicles'
emissions, fuel efficiency and performance are as advertised and publicized.

• Representing in their advertising emissions and environmental characteristics for the
Class Vehicles that are false.

126.    Plaintiff and the Class Members have suffered harm as a result of these violations.

/ / /

127.    Defendants' misrepresentations and omissions regarding the Class Vehicles' emissions, environmental standards, fuel efficiency and performance in their advertising, public statements and marketing were a material factor in inducing Plaintiff to purchase his Class Vehicle.  Plaintiff suffered injury in fact and lost money and/or property as a result of Defendants' unlawful business acts and practices and Class Members have suffered harm when each was required to pay a purchase price for their Class Vehicle in excess of what a Class Member would have paid if Defendants had accurately disclosed the Class Vehicles' characteristics and in the form of decreased resale value of the Vehicles.

128.    Defendants, and each of them, concealed from Plaintiff and the Class accurate information concerning the emissions, environmental friendliness, fuel efficiency and performance of the Class Vehicles.

129.    Defendants, and each of them, either knew that the representations were false when they made them, or they made the representations recklessly and without regard for their truth.

130.    Defendants, and each of them, had a duty to disclose the true characteristics of the Class Vehicles due to their superior knowledge as well as due to their affirmative misrepresentations regarding the environmental friendliness of the vehicles.

131.    Defendants, and each of them, intended Plaintiff and the Class to rely on their representations.  Defendants, and each of them, intended to induce Plaintiff and the Class to: (a) purchase Class Vehicles; and (b) to purchase Class Vehicles at a higher purchase price than they would have absent Defendants' misrepresentations and concealment.

132.    Plaintiff and the Class reasonably relied upon Defendants' representations regarding the characteristics of the Class Vehicles.  Plaintiff's and the Class' reasonable reliance upon Defendants' representations was a substantial factor in causing the Plaintiff's and the Class' harm.

133.    As a direct and proximate result of Defendants' fraud, Plaintiff and the Class sustained damages in an amount to be determined at trial.

///

///

134. The aforementioned acts of Defendants, and each of them, were done maliciously, oppressively, and fraudulently, and Plaintiff and the Class are entitled to punitive and exemplary damages in an amount be shown according to proof at trial.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SIXTH CLAIM

### (Breach of Implied Warranty)

### (On behalf of Plaintiff and the Class)

135. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully set forth hereinafter.

136. Defendants, and each of them, impliedly warranted to persons purchasing the Class Vehicles that these vehicles were what they were represented to be.

137. These implied warranties induced the community, in general, and Plaintiff and other Class Members, in particular, to purchase the Class Vehicles from Defendants. These implied warranties were both directly and indirectly believed and relied upon by Plaintiff and Class Members and induced them to choose Defendants' Class Vehicles. This reliance was justified by Defendants' skill, expertise, and judgment in the design, manufacturing, testing, labeling, distribution, or sale of such products.

138. At the time of the sale, Defendants had knowledge of the purpose for which their Class Vehicles were purchased and impliedly warranted the same to be, in all respects, fit and proper for this purpose.

139. Defendants, and each of them, breached their aforesaid warranties in that the Class Vehicles were not fit for the purpose for which they were intended and used; rather Defendants sold to Plaintiff and the Class products which were not fit for use as represented. The defect in the Class Vehicles existed prior to the delivery of the products to Plaintiff and the Class.

140. Plaintiff and the Class have suffered injury in fact and have suffered an economic loss by, inter alia: (a) leasing or purchasing a product they never would have leased or purchased; (b) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (c) incurring costs for diminished resale value of the

1   Class Vehicles purchased, (d) leasing and/or purchasing a product that poses a danger to the

2   health and safety of the public, (e) incurring increased costs to repair the Class Vehicles

3   purchased, and (f) incurring costs for loss of use. Accordingly, the Court must issue an

4   injunction restraining and enjoining Defendants from sending or transmitting false and

5   misleading advertising to individuals or entities concerning the purported safety and quality of

6   the Class Vehicles from Defendants.

7           WHEREFORE, Plaintiff and the Class pray for judgment as set forth below.

8                                 **SEVENTH CLAIM**

9                            **(Breach of Express Warranty)**

10                        **(On behalf of Plaintiff and the Class)**

11          141.    Plaintiff incorporates by reference each of the paragraphs set forth above as though

12   fully set forth hereinafter.

13          142.    Defendants, and each of them, expressly warranted to persons purchasing the Class

14   Vehicles that they were what they were represented to be.

15          143.    These express warranties induced the community, in general, and Plaintiff and

16   members of the Class, in particular, to use and purchase Defendants' products. These express

17   warranties were both directly and indirectly believed and relied upon by Plaintiff and the Class

18   and induced Plaintiff and the Class to choose the Class Vehicles.

19          144.    Defendants, and each of them, breached their aforesaid warranties in that their

20   products were not fit for the use and purpose expressly warranted by Defendants.

21          145.    Plaintiff and the Class have suffered injury in fact and have suffered an economic

22   loss by, inter alia: (a) leasing or purchasing a product they never would have leased or

23   purchased; (b) leasing and/or purchasing an inferior product whose nature and characteristics

24   render it of a lesser value than represented, (c) incurring costs for diminished resale value of the

25   products purchased, (d) leasing and/or purchasing a product that poses a danger to the health and

26   safety of not only the purchaser but also the public, (e) incurring increased costs to repair the

27   products purchased, and (f) incurring costs from loss of use. Accordingly, the Court must issue

28   an injunction restraining and enjoining Defendants from sending or transmitting false and

**CLASS ACTION COMPLAINT**                                                          40

1  misleading advertising to individuals or entities concerning the purported safety and quality of

2  the Class Vehicles from Defendants.

3       WHEREFORE, Plaintiff and the Class pray for judgment as set forth below.

4  **PRAYER FOR RELIEF**

5       WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, pray for relief as

6  follows:

7      1.     An Order appointing Plaintiff to represent the proposed Class pursuant to Fed. R.

8  Civ. P. 23(a) and designating his counsel as Class Counsel;

9      2.     An Order enjoining Defendants, and each of them, from future violations of the

10  CLRA, 16 C.F.R. section 259.2, Business & Professions Code section 17200, *et seq.*, Business &

11  Professions Code section 17500, *et seq.*, as alleged herein;

12      3.     An Order awarding Plaintiff and the Class restitution and/or disgorgement;

13      4.     An order awarding Plaintiff and the Class compensatory damages;

14      5.     An Order awarding Plaintiff and the Class punitive damages;

15      6.     An Order awarding Plaintiff attorneys' fees, expert witness fees and other costs,

16  including pre-judgment and post-judgment interest thereon to the extent allowed by law; and

17      7.     Such other relief as the Court deems proper.

18

19             **Respectfully submitted,**

20             **COTCHETT, PITRE & McCARTHY, LLP**

21             By:  */S/ NANCY L.FINEMAN*

22  Dated: October 1, 2015     NANCY L. FINEMAN
                nfineman@cpmlegal.com

23                  840 Malcolm Road
                Burlingame, CA 94010

24                  Tel: (650) 697-6000 / Fax: (650) 692-3606

25                  WILLIAM H. RUSSELL
                owyhee@comcast.net

26                  1721 Valley View Avenue
                Belmont, CA 94002

27                  Tel: (650) 339-2527

28                  *Attorneys for Plaintiff*

**CLASS ACTION COMPLAINT**                41

1

## JURY DEMAND

2      Plaintiff demands a trial by jury on all issues so triable.

3

4                               **Respectfully submitted,**

5                               **COTCHETT, PITRE & McCARTHY, LLP**

6

   Dated:  October 1, 2015          By:___*/S/ NANCY L.FINEMAN*___
7                                        NANCY L. FINEMAN
                                         nfineman@cpmlegal.com
8                                        840 Malcolm Road
                                         Burlingame, CA 94010
9                                        Tel: (650) 697-6000 / Fax: (650) 692-3606

10                                       WILLIAM H. RUSSELL
                                         owyhee@comcast.net
11                                       1721 Valley View Avenue
                                         Belmont, CA 94002
12                                       Tel:  (650) 339-2527

13                                       *Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**CLASS ACTION COMPLAINT**                                          42

# EXHIBIT 1



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

SEP 1 8 2015

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

Volkswagen AG
Audi AG
Volkswagen Group of America, Inc.
Thru:

David Geanacopoulos
Executive Vice President Public Affairs and General Counsel
Volkswagen Group of America, Inc.
2200 Ferdinand Porsche Drive
Herndon, VA 20171

Stuart Johnson
General Manager
Engineering and Environmental Office
Volkswagen Group of America, Inc.
3800 Hamlin Road
Auburn Hills, MI 48326

      Re:    Notice of Violation

Dear Mr. Geanacopoulos and Mr. Johnson:

The United States Environmental Protection Agency (EPA) has investigated and continues to investigate Volkswagen AG, Audi AG, and Volkswagen Group of America (collectively, VW) for compliance with the Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671q, and its implementing regulations. As detailed in this Notice of Violation (NOV), the EPA has determined that VW manufactured and installed defeat devices in certain model year 2009 through 2015 diesel light-duty vehicles equipped with 2.0 liter engines. These defeat devices bypass, defeat, or render inoperative elements of the vehicles' emission control system that exist to comply with CAA emission standards. Therefore, VW violated section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B). Additionally, the EPA has determined that, due to the existence of the defeat

devices in these vehicles, these vehicles do not conform in all material respects to the vehicle specifications described in the applications for the certificates of conformity that purportedly cover them. Therefore, VW also violated section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1), by selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing these vehicles, or for causing any of the foregoing acts.

Law Governing Alleged Violations

This NOV arises under Part A of Title II of the CAA, 42 U.S.C. §§ 7521–7554, and the regulations promulgated thereunder. In creating the CAA, Congress found, in part, that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." CAA § 101(a)(2), 42 U.S.C. § 7401(a)(2). Congress' purpose in creating the CAA, in part, was "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." CAA § 101(b)(1)–(2), 42 U.S.C. § 7401(b)(1)–(2). The CAA and the regulations promulgated thereunder aim to protect human health and the environment by reducing emissions of nitrogen oxides (NOx) and other pollutants from mobile sources of air pollution. Nitrogen oxides are a family of highly reactive gases that play a major role in the atmospheric reactions with volatile organic compounds (VOCs) that produce ozone (smog) on hot summer days. Breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion. Breathing ozone can also worsen bronchitis, emphysema, and asthma. Children are at greatest risk of experiencing negative health impacts from exposure to ozone.

The EPA's allegations here concern light-duty motor vehicles for which 40 C.F.R. Part 86 sets emission standards and test procedures and section 203 of the CAA, 42 U.S.C. § 7522, sets compliance provisions. Light-duty vehicles must satisfy emission standards for certain air pollutants, including NOx. 40 C.F.R. § 86.1811-04. The EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies applicable emission standards. Under this program, the EPA issues certificates of conformity (COCs), and thereby approves the introduction of vehicles into United States commerce.

To obtain a COC, a light-duty vehicle manufacturer must submit a COC application to the EPA for each test group of vehicles that it intends to enter into United States commerce. 40 C.F.R. § 86.1843-01. The COC application must include, among other things, a list of all auxiliary emission control devices (AECDs) installed on the vehicles. 40 C.F.R. § 86.1844-01(d)(11). An AECD is "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. The COC application must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device." 40 C.F.R. § 86.1844-01(d)(11).

A defeat device is an AECD "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and

use, unless: (1) Such conditions are substantially included in the Federal emission test procedure; (2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; (3) The AECD does not go beyond the requirements of engine starting; or (4) The AECD applies only for emergency vehicles . . . ." 40 C.F.R. § 86.1803-01.

Motor vehicles equipped with defeat devices, such as those at issue here, cannot be certified. EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972); *see also* 40 C.F.R. §§ 86-1809-01, 86-1809-10, 86-1809-12. Electronic control systems which may receive inputs from multiple sensors and control multiple actuators that affect the emission control system's performance are AECDs. EPA, *Advisory Circular Number 24-2: Prohibition of Emission Control Defeat Devices – Optional Objective Criteria* (Dec. 6, 1978). "Such elements of design could be control system logic (i.e., computer software), and/or calibrations, and/or hardware items." *Id.*

"Vehicles are covered by a certificate of conformity only if they are in all material respects as described in the manufacturer's application for certification . . . ." 40 C.F.R. § 86.1848-10(c)(6). Similarly, a COC issued by EPA, including those issued to VW, state expressly, "[t]his certificate covers only those new motor vehicles or vehicle engines which conform, in all material respects, to the design specifications" described in the application for that COC. *See also* 40 C.F.R. §§ 86.1844-01 (listing required content for COC applications), 86.1848-01(b) (authorizing the EPA to issue COCs on any terms that are necessary or appropriate to assure that new motor vehicles satisfy the requirements of the CAA and its regulations).

The CAA makes it a violation "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." CAA § 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1854-12(a)(3)(ii). Additionally, manufacturers are prohibited from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing, any new motor vehicle unless that vehicle is covered by an EPA-issued COC. CAA § 203(a)(1), 42 U.S.C. § 7522(a)(1); 40 C.F.R. § 86.1854-12(a)(1). It is also a violation to cause any of the foregoing acts. CAA § 203(a), 42 U.S.C. § 7522(a); 40 C.F.R. § 86-1854-12(a).

Alleged Violations

Each VW vehicle identified by the table below has AECDs that were not described in the application for the COC that purportedly covers the vehicle. Specifically, VW manufactured and installed software in the electronic control module (ECM) of these vehicles that sensed when the vehicle was being tested for compliance with EPA emission standards. For ease of reference, the EPA is calling this the "switch." The "switch" senses whether the vehicle is being tested or not based on various inputs including the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure. These inputs precisely track the parameters of the federal test procedure used for emission testing for EPA certification purposes. During EPA

3

emission testing, the vehicles' ECM ran software which produced compliant emission results under an ECM calibration that VW referred to as the "dyno calibration" (referring to the equipment used in emissions testing, called a dynamometer). At all other times during normal vehicle operation, the "switch" was activated and the vehicle ECM software ran a separate "road calibration" which reduced the effectiveness of the emission control system (specifically the selective catalytic reduction or the lean NOx trap). As a result, emissions of NOx increased by a factor of 10 to 40 times above the EPA compliant levels, depending on the type of drive cycle (e.g., city, highway).

The California Air Resources Board (CARB) and the EPA were alerted to emissions problems with these vehicles in May 2014 when the West Virginia University's (WVU) Center for Alternative Fuels, Engines & Emissions published results of a study commissioned by the International Council on Clean Transportation that found significantly higher in-use emissions from two light duty diesel vehicles (a 2012 Jetta and a 2013 Passat). Over the course of the year following the publication of the WVU study, VW continued to assert to CARB and the EPA that the increased emissions from these vehicles could be attributed to various technical issues and unexpected in-use conditions. VW issued a voluntary recall in December 2014 to address the issue. CARB, in coordination with the EPA, conducted follow up testing of these vehicles both in the laboratory and during normal road operation to confirm the efficacy of the recall. When the testing showed only a limited benefit to the recall, CARB broadened the testing to pinpoint the exact technical nature of the vehicles' poor performance, and to investigate why the vehicles' onboard diagnostic system was not detecting the increased emissions. None of the potential technical issues suggested by VW explained the higher test results consistently confirmed during CARB's testing. It became clear that CARB and the EPA would not approve certificates of conformity for VW's 2016 model year diesel vehicles until VW could adequately explain the anomalous emissions and ensure the agencies that the 2016 model year vehicles would not have similar issues. Only then did VW admit it had designed and installed a defeat device in these vehicles in the form of a sophisticated software algorithm that detected when a vehicle was undergoing emissions testing.

VW knew or should have known that its "road calibration" and "switch" together bypass, defeat, or render inoperative elements of the vehicle design related to compliance with the CAA emission standards. This is apparent given the design of these defeat devices. As described above, the software was designed to track the parameters of the federal test procedure and cause emission control systems to underperform when the software determined that the vehicle was not undergoing the federal test procedure.

VW's "road calibration" and "switch" are AECDs[1] that were neither described nor justified in the applicable COC applications, and are illegal defeat devices. Therefore each vehicle identified by the table below does not conform in a material respect to the vehicle specifications described in the COC application. As such, VW violated section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1), each time it sold, offered for sale, introduced into commerce, delivered for introduction into commerce, or imported (or caused any of the foregoing with respect to) one of the hundreds of thousands of new motor vehicles within these test groups. Additionally, VW

---

[1] There may be numerous engine maps associated with VW's "road calibration" that are AECDs, and that may also be defeat devices. For ease of description, the EPA is referring to these maps collectively as the "road calibration."

violated section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), each time it manufactured and installed into these vehicles an ECM equipped with the "switch" and "road calibration."

The vehicles are identified by the table below. All vehicles are equipped with 2.0 liter diesel engines.

| Model Year | EPA Test Group | Make and Model(s) |
|---|---|---|
| 2009 | 9VWXV02.035N | VW Jetta, VW Jetta Sportwagen |
| 2009 | 9VWXV02.0U5N | VW Jetta, VW Jetta Sportwagen |
| 2010 | AVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2011 | BVWXV02.0U5N | VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | CVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2012 | CVWXV02.0U4S | VW Passat |
| 2013 | DVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2013 | DVWXV02.0U4S | VW Passat |
| 2014 | EVWXV02.0U5N | VW Beetle, VW Beetle Convertible, VW Golf, VW Jetta, VW Jetta Sportwagen, Audi A3 |
| 2014 | EVWXV02.0U4S | VW Passat |
| 2015 | FVGAV02.0VAL | VW Beetle, VW Beetle Convertible, VW Golf, VW Golf Sportwagen, VW Jetta, VW Passat, Audi A3 |

Enforcement

The EPA's investigation into this matter is continuing. The above table represents specific violations that the EPA believes, at this point, are sufficiently supported by evidence to warrant the allegations in this NOV. The EPA may find additional violations as the investigation continues.

The EPA is authorized to refer this matter to the United States Department of Justice for initiation of appropriate enforcement action. Among other things, persons who violate section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), are subject to a civil penalty of up to $3,750 for each violation that occurred on or after January 13, 2009;[1] CAA § 205(a), 42 U.S.C. § 7524(a); 40 C.F.R. § 19.4. In addition, any manufacturer who, on or after January 13, 2009, sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported, or caused any of the foregoing acts with respect to any new motor vehicle that was not covered by an EPA-issued COC is subject, among other things, to a civil penalty of up to $37,500 for each violation.[2] CAA § 205(a), 42 U.S.C. § 7524(a); 40 C.F.R. § 19.4. The EPA may seek, and district courts may order, equitable remedies to further address these alleged violations. CAA § 204(a), 42 U.S.C. § 7523(a).

---

[1] $2,750 for violations occurring prior to January 13, 2009.
[2] $32,500 for violations occurring prior to January 13, 2009.

The EPA is available to discuss this matter with you. Please contact Meetu Kaul, the EPA attorney assigned to this matter, to discuss this NOV. Ms. Kaul can be reached as follows:

> Meetu Kaul
> U.S. EPA, Air Enforcement Division
> 1200 Pennsylvania Avenue, NW
> William Jefferson Clinton Federal Building
> Washington, DC 20460
> (202) 564-5472
> kaul.meetu@epa.gov

Sincerely,

Phillip A. Brooks
Director
Air Enforcement Division
Office of Civil Enforcement

Copy:
Todd Sax, California Air Resources Board
Walter Benjamin Fisherow, United States Department of Justice
Stuart Drake, Kirkland & Ellis LLP

# EXHIBIT 2



**VOLKSWAGEN**

AKTIENGESELLSCHAFT

GROUP EU REPRESENTATION/VGS



# The Volkswagen Group – "Forschungsweltmeister"

Julian Herwig, Environment & Technical Affairs

Volkswagen Group EU Representation

29 January 2015

VOLKSWAGEN
AKTIENGESELLSCHAFT

GROUP EU REPRESENTATION/VGS

# Global Research Activities



# EXHIBIT 3



# Air Resources Board

**Mary D. Nichols, Chair**
9480 Telstar Avenue, Suite 4
El Monte, California 91731 • www.arb.ca.gov



**Matthew Rodriquez**
*Secretary for
Environmental Protection*

**Edmund G. Brown Jr.**
*Governor*

Reference No. IUC-2015-007

September 18, 2015

Volkswagen AG
Audi AG
Volkswagen Group of America, Inc.
Through:

David Geanacopoulos
Executive Vice President and General Counsel, Government Affairs
Volkswagen Group of America
2200 Ferdinand Porsche Drive
Herndon, VA 20171

Stuart Johnson
General Manager
Engineering and Environmental Office
Volkswagen Group of America
3800 Hamlin Road
Auburn Hills, MI 48326

Re: Admission of Defeat Device and California Air Resources Board's Requests

Dear Mr. Geanacopoulos and Mr. Johnson:

In order to protect public health and the environment from harmful pollutants, the California Air Resources Board (CARB) rigorously implements its vehicle regulations through its certification, in use compliance, and enforcement programs. In addition to the new vehicle certification process, CARB regularly tests automobiles to ensure their emissions performance is as expected throughout their useful life, and performs investigative testing if warranted. CARB was engaged in dialogue with our European counterparts concerning high in use emissions from light duty diesels. CARB deployed a number of efforts using portable measurement systems and other approaches to increase our understanding for the California fleet. In 2014, the International Council for Clean Transportation (ICCT) and West Virginia University (WVU) identified through their test program, and brought to the CARB's and the United States Environmental Protection Agency's (EPA) attention, concerns of elevated oxides of nitrogen (NOx) emissions over real world driving. The ICCT actions were consistent and

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption. For a list of simple ways you can reduce demand and cut your energy costs, see our website: http://www.arb.ca.gov.*

California Environmental Protection Agency

*Printed on Recycled Paper*

Mr. Geanacopoulos and Mr. Johnson:
September 18, 2015
Page 2

complementary to our activities. This prompted CARB to start an investigation and discussions with the Volkswagen Group of America (VW) on the reasons behind these high NOx emissions observed on their 2.0 liter diesel vehicles over real world driving conditions. As you know, these discussions over several months culminated in VW's admission in early September 2015 that it has, since model year 2009, employed a defeat device to circumvent CARB and the EPA emission test procedures.

VW initiated testing to replicate the ICCT/WVU testing and identify the technical reasons for the high on-road emissions. VW shared the results of this testing and a proposed recalibration fix for the Gen1 (Lean NOx Trap technology) and Gen2 (Selective Catalytic Reduction (SCR) technology) with CARB staff on December 2, 2014. Based on this meeting, CARB and EPA at that time agreed that VW could implement the software recall; however, CARB cautioned VW that if our confirmatory testing showed that the fix did not address the on-road NOx issues, they would have to conduct another recall. Based on this meeting, VW initiated a voluntary recall in December 2014 which, according to VW, affected approximately 500,000 vehicles in the United States (~50,000 in California). The recall affected all 2009 to 2014 model-year diesel fueled vehicles equipped with Gen1 and Gen2 technology. This recall was claimed to have fixed among other things, the increased real world driving NOx issue.

CARB commenced confirmatory testing on May 6, 2015 to determine the efficacy of the recall on both the Gen1 and Gen2 vehicles. CARB confirmatory testing was completed on a 2012 model-year Gen2 VW, test group CVWX02.0U4S, to be followed with Gen1 testing. CARB staff tested this vehicle on required certification cycles (FTP, US06 and HWFET) and over-the-road using a Portable Emission Measurement Systems (PEMS). On some certification cycles, the recall calibration resulted in the vehicle failing the NOx standard. Over-the-road PEMS testing showed that the recall calibration did reduce the emissions to some degree but NOx emissions were still significantly higher than expected.

To have a more controlled evaluation of the high NOx observed over the road, CARB developed a special dynamometer cycle which consisted of driving the Phase 2 portion of the FTP repeatedly. This special cycle revealed that VW's recall calibration did increase Diesel Exhaust Fluid (DEF) dosing upon initial startup; however, dosing was not sufficient to keep NOx emission levels from rising throughout the cycle. This resulted in uncontrolled NOx emissions despite the SCR reaching sufficient operating temperatures.

CARB shared its test results with VW on July 8, 2015. CARB also shared its results with the EPA. Several technical meetings with VW followed where VW disclosed that Gen1, Gen2 and the 2015 model-year improved SCR vehicle (known as the Gen3) had a second calibration intended to run only during certification testing. During a meeting on September 3, 2015, VW admitted to CARB and EPA staff that these vehicles were

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption. For a list of simple ways you can reduce demand and cut your energy costs, see our website: http://www.arb.ca.gov.*

California Environmental Protection Agency

*Printed on Recycled Paper*

Mr. Geanacopoulos and Mr.Johnson:
September 18, 2015
Page 3

designed and manufactured with a defeat device to bypass, defeat, or render
inoperative elements of the vehicles' emission control system. This defeat device was
neither described nor justified in the certification applications submitted to EPA and
CARB. Therefore, each vehicle so equipped would not be covered by a valid federal
Certificate of Conformity (COC) or CARB Executive Order (EO) and would be in
violation of federal and state law.

Based upon our testing and discussions with VW, CARB has determined that the
previous recall did not address the high on-road NOx emissions, and also resulted in
the vehicle failing certification standards. Therefore, the recall is deemed ineffective
and is deemed unapproved. VW must immediately initiate discussions with CARB to
determine the appropriate corrective action to rectify the emission non-compliance and
return these vehicles to the claimed certified configuration. CARB program and
enforcement staff is prepared to work closely with VW to find corrective actions to bring
these vehicles into compliance.

CARB has also initiated an enforcement investigation of VW regarding all model-year
2009 through 2015 light-duty diesel vehicles equipped with 2.0 liter engines. We expect
VW's full cooperation in this investigation so this issue can be addressed expeditiously
and appropriately.

Sincerely,

Annette Hebert, Chief
Emissions Compliance, Automotive Regulations and Science Division

cc:   Mr. Byron Bunker, Director
     Compliance Division
     Office of Transportation and Air Quality
     Office of Air and Radiation
     U.S. Environmental Protection Agency

     Mr. Linc Wehrly, Director
     Environmental Protection Agency
     Light-Duty Vehicle Center
     2000 Traverwood Drive
     Ann Arbor, MI 48105

     Dr. Todd P. Sax, Chief
     Enforcement Division
     California Air Resources Board

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption.
For a list of simple ways you can reduce demand and cut your energy costs, see our website: http://www.arb.ca.gov.*

California Environmental Protection Agency

Printed on Recycled Paper